# CHARLESTON.

### STATE v. JOHN BARKER.

Submitted November 21, 1922.    Decided December 12, 1922.

1. CRIMINAL LAW—*Verdict Not Reversed Unless Clearly Unwarranted by Evidence.*

    Where a verdict in a criminal case is sought to be set aside by the accused on the ground that the evidence is not sufficient to support the verdict, the opinion of the court which tried the case is entitled to great weight, and the appellate court will not reverse unless it is clear that the verdict is unwarranted by the evidence and that the jury was influenced by bias, passion, prejudice or some ulterior motive. (p. 588).

2.    SAME—*Exclusion of Evidence to Prove Admitted Fact Not Error.*

Where a fact has been proven or admitted by the prosecution in the trial of a criminal case, it is not error to refuse to admit evidence offered by the accused to prove the fact already established. (p. 589). .

3.    SAME—*Instructions Should not be Given Where no Evidence Tending to Prove Facts Upon Which Based.*

Instructions should not be given when there is no evidence tending to prove the facts upon which they are based. Such instructions tend to mislead the jury by withdrawing their consideration from the issues involved. (p. 590).

4.    SAME—*Temporary Separation of Juror in Presence of Attending Officers Held Not Ground for Setting Aside Verdict.*

It is not every separation of the jury in a criminal case, though improper and irregular, that will warrant the setting aside of the verdict, if it be against the accused; and where one of the jurors who were retiring from a dining room at a hotel, in charge of the proper officers, steps out of line, with permission of one of the officers, and in his sight and hearing and near him steps across the lobby and purchases a cigar from the hotel clerk, is furnished a light therefor by a bystander, has no conversation with any one, and immediately goes back to the other jurors, accompanied by the officer, such separation is not sufficient to set aside a verdict against the accused, although it may appear that a large number of men were in the lobby, possibly discussing with each other the incidents of the trial, it also appearing that those in the immediate presence of the juror could not remember what, if anything, had been said in his hearing. (p. 591).

Error to Circuit Court, Morgan County.

John Barker was convicted of rape, and he brings error.

*Affirmed.*

*J. Hammond Siler* and *Luttrell & Rogers,* for plaintiffs in error.

. *E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

Appellant, John Barker, was convicted of rape upon Mary Gallaher, a girl eleven years of age, large for her age, and

on April 5, 1922, sentenced to the penitentiary for five years. The jury recommended mercy in its verdict. This writ is to review that judgment.

Defendant was married, 39 years old and was working for E. R. Gallaher, the girl's father, and had completed 12 days of labor which he had contracted to exchange for a double barrelled shot gun owned by his employer. The alleged crime took place between 5 and 6 o'clock, October 8, 1921. The girl, her two brothers, Paul aged about 14, Joe about 8 years old, and the accused returned to the Gallaher home in the late afternoon from a near by railroad where the accused and Paul had been to get some cross ties, accompanied by the two children. The latter two went into the house, and the accused went to feed the pigs. Later, Mary went down the hill to drive up the milk cows, and she says the accused was sitting on a stone at the foot of the hill about a quarter of a mile from the house, and as she passed him he caught her and committed a rape upon her. She then went on after the cows, which were near by, and drove them home. When she returned to the house, supper was ready, and her sister Emma, 16 years of age, who had cooked supper, her three brothers, Frank, aged about 22, Paul, Joe and her father, were preparing to sit down to the evening meal. The accused had washed and was combing his hair, and was in the kitchen which was used as a dining room also. The testimony of all of the family, including the girl, as to what then occurred, is practically the same. When she entered the room she was crying, and her father asked her what was the cause, and she replied, "That dirty devil over there, (pointing to accused), caught me." She said she told her father Mr. Barker caught her down at the foot of the hill. The father, who was afflicted with a carbuncle on one of his legs, and who had been lying on the bed with his shoes off, struck accused with his fist and knocked him down, struck him again on the head two or three times with his fist and then attempted to stomp him in the face with his bare heels; accused regained his feet exclaiming, "Dolph, don't kill me, I will take prison," or "I will go to the pen," or some such exclamation, jumped over

the stove and ran out of the house, disappearing in the gathering twilight. Defendant's version of the dining room scene is practically the same, with these exceptions: he says that when Mary came in crying her father asked her what was wrong, and she replied, "You know what is wrong, that man (pointing at me) insulted me." He denied having said anything about "going to the pen"; or rather he said he had no recollection of saying any words of that import, that the blow "knocked all the sense out of me." The father went to Berkeley Springs, 27 miles away, on the following Monday (the alleged crime having been committed Saturday near dark) to obtain a warrant for the accused. He did not go on Sunday for that purpose, giving as a reason that he did not think he could obtain a warrant on the Sabbath. The sheriff accompanied by an officer and the father then drove to the house of the accused, and after a close search finally discovered him hid in a corner of one of the rooms covered over with some old comforts, and placed him under arrest. Defendant says he did not know it was the sheriff after him; supposed it was "moonshiners" coming to kill him.

At the suggestion of the sheriff, Dr. J. R. Kirk was sent to make an examination of the girl. He arrived on the 11th (Monday) or the 12th (Tuesday), and found her female organs torn, "the lower part torn quite a lot, showed there had been some force of some kind used there." He found the womb had been torn some; and what is known as the "hymen," the membrane of the vagina, had been torn open. He said the wounds were of recent occurrence, within two or three days. On cross examination he said the wounds could have been made by some blunt instrument in the hands of the girl. The girl stated that four or five years before, a boy of sixteen had forced her, and had intercourse with her. The doctor was asked if that would not have ruptured the hymen, and replied that it was possible that the hymen was not then broken, but not probable, depending upon the size and force.

Defendant denied having committed the crime. His theory was that the girl's father and brothers were making moonshine liquor, and he says he visited stills seemingly owned

and operated by them in the near vicinity of their home in their company, and it was to close his mouth (he says he had been telling people Gallahers were making liquor) and remove him from the neighborhood that the charge of rape was preferred against him.  He says that all the family, the father, boys and girls (the mother was dead), were habitual drinkers of moonshine liquor, and that they "fed me up on it" while he worked there.  This testimony is denied by the Gallaher family.  A search warrant in the hands of the sheriff brought no tangible evidence of illicit distilling by the Gallahers, and the grand jury investigated the charge without finding an indictment.  The investigation of the officers developed suspicion that illicit distilling had been carried on in that vicinity, and possibly with the knowledge of the father, but by whom and when, was rather indefinite.  The sheriff visited the Gallaher home with his search warrant on the 13th, five days after the alleged offense, and saw the girl. He was asked what she was doing, and replied that she was out playing around the yard, when an objection was interposed by the state and sustained.  One of the points of error is based on this action of the court.

Dr. Kirk (examined for the defense), whose practice extended over 21 years, said that defendant's intellect and mentality were below the average; that he was not insane nor a lunatic, and knew the difference between right and wrong. Accused is six feet two inches in height, weight 124 lbs. and wears a No. 6 5/8 hat.  His mother says his mind was not well developed, that a boy of 12 years of age had more sense than he had; that he had his head hurt while working as a brakeman on a railroad train, and when he got whisky he acted as if he was crazy.  His wife says that when he came home from Gallaher's on the Saturday night of the alleged crime, he was sick and weak, but does not say that he was then intoxicated. Defendant says he had been drinking on that Saturday but was not drunk and knew what he was doing.

The girl says that on the night of the crime she went to bed as usual, and next day performed her usual domestic duties about the house, and continued to do so, without much in-

convenience, except that she was sore, and it hurt her to go down hill. Other members of the family say she did not seem to suffer greatly and went about her usual duties on the days following.

The assignments of error are: (1) Refusal of the court to direct a verdict for defendant; (2) Refusal to permit sheriff Dyche to testify as to the physical condition of Mary Gallaher on October 13, 1921; (3) giving of instructions for state, and refusing instructions offered by defendant; (4) Refusing to set aside the verdict and grant a new trial (which includes all of the other assignments); and also because of improper conduct of one of the jurors.

The evidence has been detailed at more than usual length because of the first assignment of error, which is to the effect that the evidence is not sufficient to sustain a verdict of guilty. It is argued that the girl's statement is uncorroborated; that evidence of physical violence, such as torn and bloody clothing, was wanting, and that her actions immediately after, in driving up the milk cows, coupled with little physical discomfort then and on the days following made her story unworthy of belief. It is further argued that the action of defendant in returning to the house for supper, where he engaged in friendly conversation with the father, within thirty minutes after the alleged crime, knowing the alleged victim would soon make her appearance, denotes his innocence. The motion to direct a verdict for defendant, and the motion to set aside the verdict because the evidence was not sufficient to sustain it, are properly considered together, for in a motion for a directed verdict the court is guided by what its action would be if the case was submitted to the jury and its finding should be for plaintiff upon such evidence. If the court would set aside the verdict because of insufficient evidence, then it should upon motion direct a verdict. *Cobb* v. *Lumber Co.,* 57 W. Va. 49; *Hoylman* v. *Railway Co.,* 65 W. Va. 264. Motions for new trials in criminal cases are governed by the same rules that apply in civil cases. *Vaiden* v. *Commonwealth,* 12 Grat. 717; *State* v. *Thompson,* 21 W. Va. 741. It is a well settled rule that the appellate court will

not set aside a verdict upon the ground of insufficiency of the evidence unless it is manifestly wrong, as great weight and consideration is given to the verdict, approved by the trial judge, both judge and jury having observed the conduct and demeanor of the witnesses and consequently could better judge of their credibility. *State* v. *Donahoe*, 22 W. Va. 761; *Lewis* v. *Commonwealth*, 81 Va. 416; *Cluverius* v. *Com.*, 81 Va. 787; *Pryor* v. *Com.*, 27 Grat. 1010. A new trial should not be given because the judge if he had been a member of the jury, would have found a different verdict. Upon these well established principles can we say the evidence does not warrant the verdict? Verdicts in prosecutions for rape have been sustained upon uncorroborated evidence of the female raped, although of tender years. *Smith* v. *Com.*, 85 Va. 924; *Givens* v. *Com.*, 29 Grat. 830. But here, we have her prompt accusation, and the flight and hiding of the accused, in addition to the testimony of Dr. Kirk that he hymen was torn open and the lower part of her female organs lacerated. While the recorded cases are not numerous, men of mature years have been convicted of such criminal assaults upon girls of tender years, brutal and unnatural though it may seem. Unfortunately, the record does not disclose the height, weight and physical maturity of the prosecutrix. Her testimony evidences an unusual degree of intelligence for one of her age. Evidence of the usual nervous prostration and continued physical impairment which might be expected are lacking; but these, no doubt, were all circumstances considered by the jury, who from personal observation of the parties were in better position to judge than one who reads the printed lifeless record of the sordid affair. We conclude that the evidence was sufficient to sustain the verdict, and the motion to instruct, together with the motion to set aside the verdict for that reason, were properly overruled.

The second point of error is based on the refusal of the court to allow sheriff Dyche to testify to the physical condition of the prosecutrix as he observed her at her father's home on the fifth day after the crime. The question was, ''What was she doing that day?'', and the answer was, ''She

was out playing around the yard—'', when objection was interposed and sustained. The defense offered to show by the evidence that she ran up a steep hill which the sheriff had difficulty in climbing. It is argued that she was in good physical condition and showed no outward evidence of having been raped five days previous, and that the sheriff would have so stated. Even if his evidence would have been as proffered, it would only be cumulative of a fact freely testified to by the girl herself and already established by the state. It was shown by herself and members of her family that the following, and succeeding days, she played, and discharged her usual duties. There was no contention that her condition was otherwise at that time. The trial court considered the time too remote from the alleged offense.

The third assignment of error is to the refusal of the court to give instructions 2, 3 and 4, which would have told the jury that if they believed beyond a reasonable doubt that the accused committed the alleged offense, yet if they believed he was insane at the time, or did not have reason sufficient to enable him to distinguish between right and wrong, or understand the nature, character and consequences of his act, or by reason of his insanity he did not have sufficient will power to restrain his impulse arising from a diseased mind, they should find him not guilty. There was no evidence on which to predicate these instructions. Dr. Kirk, who was introduced by the defense for that purpose, said he was not insane, though his mentality was below the average mind, but that he knew the difference between right and wrong. His mother said he had the mind of a child, but does not pretend to say he was insane. She says he ''acts crazy and aint got no sense when he is drunk,'' but, it does not appear that he was drunk at the time of the commission of the crime. He denied that he was drunk on that occasion, and says he remembered well everything that occurred. His wife does not say he was intoxicated when he came home that night. She says his physical condition was bad as the result of a bowel trouble. The Gallahers say he was not drunk. However, voluntary intoxication is ordinarily no excuse for crime. The

common law regarded it as a step toward the wrong, if not the wrong itself. So that if one voluntarily became drunk and in that condition committed a crime he was punishable as though he committed the crime without passing to it through the door of intoxication. Bishop's New Crim. Law, sec. 400. *State* v. *Robinson,* 20 W. Va. 713; *State* v. *Shores,* 31 W. Va. 491. The defense of "irresistible impulse" is discussed in *State* v. *Harrison,* 36 W. Va. 729, where it is held that where a person is partially insane, if at the time of the act he knows right from wrong, and that his act is hurtful to another, he is responsible and deserves punishment; and no mere irresistible impulse to do the act will relieve him from criminal responsibility. However, we see little application of that doctrine here, where the accused by his medical expert has shown that he was not insane partially, but had a low grade of mentality, and well knew right from wrong. Instructions should not be given where there is no evidence tending to prove the facts on which they are based. Cases cited, Va. & W. Va. Digest, Vol. 7 p. 718.

The remaining assignment of error is based upon misconduct of one of the jurors, which, it is argued, was prejudicial to the prisoner. After the case had been submitted, the jury in charge of sheriff Dyche and deputy sheriff Hobday, was taken to the Hotel Washington for dinner, and after the meal, juror Lineweaver, with permission of the deputy sheriff, stepped out of line, in coming from the dining room, over to the clerk's desk in the lobby where he purchased a cigar, and not having a match, a bystander, H. D. Beeler, struck a match and held it for the juror to light the cigar. The juror then was joined by the deputy and another juror and went away with the others. It appears that no conversation was had by any one with the juror, and all that was spoken by him was a request for the cigar. It further appears that the day was stormy, and approximately twenty-five men were in the lobby at the time, some of them discussing the trial and its incidents, and possibly the guilt or innocence of the accused. It is argued that the juror must have heard some of the discussion, presumably that part which might have been

against the innocence of the accused. Some of the affiants declare that the juror was not accompanied by nor within sight of the deputy, and they are uncertain just how long he remained at the counter. The deputy and the juror say they were in sight of each other, both detailing minutely the incident, and saying that no one spoke to the juror, that the deputy accompanied the juror and that they remained at the clerk's desk only a sufficient time to purchase and light the cigar, immediately joining the other jurors. Beeler says that some of the men in the lobby were standing near the counter engaged in conversation, but does not recall just what they were saying; and that a few moments after the incident the prosecuting attorney remarked to the deputy, "that is a separation of the jury." The hotel clerk, N. B. Miller, corroborates the deputy and juror, except he says he did not see the deputy until after he had delivered the cigar to the juror. He does not know what was being said by others in the room at the time, but has no doubt that a large number of men in the lobby were discussing the trial. No one attempts to detail what was said by any one in the lobby with reference to the trial either for or against the prisoner. They have no doubt that the trial was being discussed.

Where there is an improper separation or misbehavior of the jury, there is a presumption that the accused has been prejudiced if the verdict be against him. This presumption can be rebutted, and if the court be satisfied that the prisoner has sustained no injury therefrom the verdict will not be set aside. The burden is on the prosecution to rebut the presumption beyond a reasonable doubt. *State* v. *Cartright,* 20 W. Va. 33; *State* v. *Cotts,* 49 W. Va. 615; *State* v. *Driver,* 88 W. Va. 479. The very able and learned trial judge was not convinced that the prisoner had been prejudiced by this incident; and we think the presumption of injury to the prisoner has been successfully rebutted.

Finding no reversible error, the judgment is affirmed.

*Affirmed.*