STATE OF WEST VIRGINIA *v.* WILLIE BECKNER

(No. 8488)

Submitted February 24, 1937. Decided March 23, 1937.

*M. F. Matheny,* for plaintiff in error.

*Clarence W. Meadows,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

FOX, JUDGE:

The defendant, Willie Beckner, was indicted in the Intermediate Court of Kanawha County, charged with the murder of J. S. Page, locally known as Cy Page. On this charge he was tried, a verdict of guilty of murder in the first degree, without further finding, returned by the jury, and a sentence of death was pronounced. A motion to set aside the verdict and grant a new trial, interposed prior to the sentence, was overruled. Later, during the term at which the trial and conviction were had, the defendant appeared, by his counsel, and again moved that the judgment imposing sentence be set aside, and that a new trial be granted him, on the grounds of after discovered evidence bearing upon his alleged mental state at the time of the commission of the crime.

This motion was likewise overruled, and to the action of the court, on said motions, the defendant prosecutes this writ of error.

In view of the importance of this case, it seems appropriate that a complete statement of the nature of the crime and all steps leading up to the trial and conviction be made.

J. S. Page, an aged resident of a remote section of Kanawha County, was killed on the 6th day of May, 1936. Shortly after the killing, suspicion was directed toward the defendant, and he was placed in custody. On the 9th day of May, 1936, he made a statement, in writing, admitting that he shot Page, and detailed the circumstances under which the crime was committed; this statement was signed by him, and was sworn to before a notary public; later, on the 11th day of May, 1936, he made a further statement, with regard to the crime, in the form of answers to questions which were propounded to him by an official of the prosecuting attorney's office, and in the presence of a member of the Department of Public Safety; this statement was taken down by a notary public, signed by the defendant, and sworn to by him. In both of these statements the defendant states that they were voluntarily made without promises or threats.

The indictment in the case was returned on the 13th day of June, 1936. Two days thereafter, the defendant was arraigned, two reputable and capable members of the bar were assigned as his counsel to defend him, and his case was set to be tried on June 23rd, following. On the day fixed for the trial, an able attorney appeared in court and announced that he had been requested by counsel formerly assigned to represent the defendant in the case, and the court permitted the substitution of counsel to be made. There is nothing in the record showing whether counsel first assigned, or either of them, had made any investigation of the case. After new counsel had been assigned, an opportunity was given him to confer with the defendant and his father, and he did so, for a period of about one hour. During this conference, coun-

sel was furnished with the two statements made by the defendant, and after the conference was completed, he returned into court and discussed the matter of trial with the prosecuting attorney and with the court. At this conference with the prosecuting attorney and the court, the matter of having the question of the sanity of the defendant submitted to a jury was discussed, and the prosecuting attorney at that time stated that if such a question were raised, he would want time for preparation on that point. Upon being asked by the court whether he had any evidence to sustain a plea of insanity, counsel for the defendant replied that he knew of no evidence he could introduce to sustain such plea, and thereupon the court stated that if he had no available evidence at hand, he saw no reason for delaying the case. There was no request for a continuance, on the part of the defendant, or his counsel, and the trial immediately followed, resulting in the conviction and sentence as stated above.

The evidence introduced at the trial of the case developed that Page lived alone on a farm and that the defendant conceived the idea that he had money in his possession. On the day of the murder, the defendant left his home about eight or eight-thirty in the morning and went to the Page home, and found him absent. Page came to his house about the middle of the day, and then went back to his work which was some distance from the house occupied by him. Some time after the noon hour, the defendant broke into the Page house, thinking he would find money there. After he entered the house, he made a search but was unable to find any money, but did find a single barrel shot-gun and two shells which he carried away with him. He then went to a point near the place where Page was at work, and remained there until five or six o'clock in the evening, when ·Page stopped work and started home. When he passed near where the defendant was stationed, he was shot by him with the shot-gun he had stolen earlier in the day, and the defendant then ran away, went around the hill a distance and threw away the gun with which he had perpetrated the crime. Shortly after this, the defendant passed near the

house of Leonard Martin and made some statement to Martin to the effect that he was "dodging the law". A short time thereafter, he went back to Martin and told him that "Cy Page was over there in the field and 'he is shot and dead or about dead' ". A man by the name of Wilkerson was called and Wilkerson, the defendant, and perhaps others went to where Page was lying; he was picked up, the defendant helping, and moved from the place where he was found to a point from whence he was finally brought to a hospital in Charleston, where he died the next day. All of these facts appear from the two statements made by the defendant and are corroborated by a number of witnesses who saw the defendant on the day of the murder. There are no disputes as to the facts in the case and no extenuating circumstances shown. The evidence clearly shows the commission of a deliberate and premeditated killing, and that the motive which prompted the act was robbery.

There were no objections in the trial to the admission of any testimony; no objections to the instructions given by the court; and counsel for the defendant, as appears from the record, was accorded every consideration in preparing himself for trial, after he appeared in court; and, indeed, there is no complaint as to the fairness of the trial, or the correctness of the jury's verdict, on the evidence presented.

The defendant bases his motion for a new trial solely on the ground that after the trial of the case and after the sentence, his counsel first learned that there was some question as to the mental capacity of the defendant. Counsel, in his affidavit, and in presenting his motion for a new trial, states that a number of people living in the vicinity where the crime was committed, and where the defendant lived, communicated to him their belief that the defendant was not of sound mind. Counsel, in addition to filing his own affidavit, and in a diligent effort to represent his client, secured a number of affidavits, all bearing upon the mental responsibility of the accused. Reading these affidavits and accepting what they contain as true, we find that the defendant had a

"savage and ungovernable temper and at other times he was meek and lowly and in an attitude of sorrow"; that "he was of unsound mind and low mentality and at various times wholly unable to govern his actions"; that "he seemed weary, restless and sorrowful"; that "his mind never fully developed"; that "he was a person of unsound mind and wholly incapable of transacting the affairs of life in a sensible, ordinary way"; that "he was afraid to go out in the dark"; that "he was afraid something would get him"; that "he had the mind of a very small child"; and one affiant says that "he has the mind of a very small child and does not seem at times to know right from wrong". The parents of the defendant filed an affidavit to the effect that he was "of a weak mentality and unsound mind and that while he had grown to the age of 29 years, his mind never developed to a greater degree than that of a small child". But it must be borne in mind that the father of defendant was present at the trial of the case, and must have had knowledge of his son's condition at that time. These affidavits do no more than tend to establish the weak mentality of the defendant and his peculiarities, and fall far short of showing that he was incapable of knowing right from wrong, even in the general transactions of life, much less with respect to the commission of the crime for which he was convicted. It is true that one affiant states that at times the defendant did not seem to know right from wrong, but this one statement should not be allowed to control the effect of the affidavits, taken as a whole, which do not establish anything more than that the defendant was a person of low mentality.

We would not be understood as stressing too strictly the obvious fact that the defendant has not brought himself within the rule imposed by our practice with respect to the granting of a new trial on the ground of after discovered testimony. In the ordinary case, not only must that testimony not have been known to the defendant or his counsel, but the circumstances must have been such that it could not have been discovered by the exercise of reasonable diligence. In view of the serious consequences

depending upon our decision, we would be disposed to somewhat relax the rule as to the matter of diligence in presenting the evidence, or in failing to discover it, could we believe that the evidence when presented to a jury on a new trial, would bring about a different result. In our view of the case, the facts stated in the affidavits relied upon, if presented to a jury in the form of testimony, would not be sufficient to establish the insanity of the defendant, and, therefore, we cannot say that had this evidence been presented to the jury at the trial, a different verdict would have resulted. We cannot justify the setting aside of a verdict on the ground of after discovered evidence merely because there exists a possibility that a new trial may produce a different verdict.

The matter of the alleged insanity of the defendant could have been tested under the plea of not guilty. *Baccigalupo* v. *Commonwealth,* 33 Gratt. (74 Va.) 807, 36 Am. Rep. 795; *Gruber* v. *State,* 3 W. Va. 699; *Stover* v. *Commonwealth,* 92 Va. 780, 22 S. E. 874; *State* v. *Fugate,* 103 W. Va. 653, 138 S. E. 318. In two Virginia cases, *Stover* v. *Commonwealth, supra,* and *Wood* v. *Commonwealth,* 146 Va. 296, 135 S. E. 895, it was held that the defendant's insanity was put in issue by his plea of not guilty. The force of the two decisions last cited may be somewhat lessened by the fact that in those cases, the question of the defendant's insanity was actually considered, whereas in the case now before the court, there was no such test. While the fact that the father of the defendant was present at the trial, consulted with his counsel before the trial began, and must have known as much about the mental condition of his son at that time as he knew at the time he filed his affidavit later on, may throw some doubt on this later attempt to show insanity, the real test comes when we consider the weight of the affidavits filed, admitting that what they contain would be supported by evidence on a new trial. The law governing trial of criminal cases, where the defense of insanity is interposed, is well settled in this country and in this state.

The fundamental basis of the rule, followed in this

country, we find stated by an eminent English judge to be as follows:

> "The jury ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved, that, at the time of the committing of the act, the party accused was labouring under such a defective reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong."

16 Corpus Juris, 100. What is known as the right and wrong test has been substantially adopted by most American courts, and it is that:

> "* * * the general test of responsibility for crime may be stated to be the capacity to understand the nature of the act charged and the ability to distinguish between right and wrong as to such act."

16 Corpus Juris, *supra*. To the same effect is the rule stated in 14 R. C. L. 599. In this state, the leading case on the subject is that of *State* v. *Harrison*, 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224, wherein Judge Brannon says:

> "A person partially insane is yet responsible for a criminal act if at the time of the act he knows right from wrong, and knows the nature and character of the particular act and its consequences, and knows that it is wrong and is hurtful to another and deserves punishment. In such case no mere irresistible impulse to do the act will exempt him from criminal responsibility for such act."

That case has been followed by *State* v. *Barker*, 92 W. Va. 583, 115 S. E. 421; *State* v. *Evans*, 94 W. Va. 47, 117 S. E. 885; *State* v. *Fugate, supra.*

Comment has been made as to the effect of the affidavits filed, admitting that the statements therein would be supported by evidence on a new trial. As stated above, we do not consider them sufficient to establish insanity. We find nothing in the record to justify a finding that this defendant did not know right from wrong. In some manner, he had learned that his victim had accumulated money which he thought he might be able to secure. He went from his home in the morning to the Page homestead and remained in that immediate vicinity all day; he first broke into the Page home and made a search for money without success, but he did find and carry away a shot-gun and two shells, thus preparing himself for the fell purpose he had in mind; he then followed his victim to the place where he was working, and remained in hiding during the afternoon, and until later in the evening, when from ambush, he fired the fatal shot; he was then careful to throw away the gun and the one remaining shell, and to further cover up the commission of his crime, by a circuitous route, went, to or near, a neighbor's house and gave an alarm; he then went back to where his victim was lying and assisted in transporting him to some point from whence he was brought to a hospital in Charleston. His entire conduct, throughout the day of the murder, was that of a reasoning being, and is far removed from any irresistible impulse, insane delusion, or any other explanation, except to rob this old man, even if it was necessary to take his life to accomplish that purpose. Under these circumstances, the jury was fully warranted in its verdict, and would have been so warranted had there been produced all of the testimony as to insanity, indicated by the affidavits filed on the motion for a new trial. Such being the case, there is no ground upon which this court can justify the granting of a new trial.

It may be said that if, in fact, defendant was insane before and at the time of his trial, he should not be charged with failure to advise his counsel of his condition. This is not a new situation. In many cases, more or less similar to this one, attempts have been made to se-

cure new trials on after discovered testimony tending to show insanity of the accused. *Jackson* v. *State,* 161 Ind. 36, 67 N. E. 690; *Donahue* v. *State,* 165 Ind. 148, 74 N. E. 996; *James* v. *State,* 150 Ga. 76, 102 S. E. 425; *People* v. *Johnson,* 298 Ill. 52, 131 N. E. 149; *Terlizzi* v. *State,* 198 Ind. 491, 154 N. E. 276. In *James* v. *State, supra,* the court said:

> "A new trial will not be granted on account of newly discovered evidence to the effect that the 'defendant's mind is weak and has been weak all of his life', and from observation of that fact the witness believes the defendant does not know the distinction between right and wrong; especially where the affidavits in regard to diligence failed to meet the requirements of the law. It is not made to appear that counsel for the accused, who was absent at the trial, did not know the alleged newly discovered facts prior to the trial of the case."

Here, of course, counsel representing the defendant claims that he did not know the facts, with reference to the mental state of the defendant, until after the trial, but as in the case of *Terlizzi* v. *State, supra,* at least one witness who could have testified as to these facts, namely, the father of the defendant, was present, the question of filing a plea of insanity was considered before the trial, and every opportunity was given both counsel and the defendant to have this question passed upon by a jury. The defendant, not having availed himself of that privilege, cannot, at this late day, say that he was deprived of any right or opportunity of raising this question.

It may be that there are circumstances surrounding this crime, and the trial and conviction of the accused, especially his mental state, which call for some consideration, by agencies of government not restrained by rules of law long established, the maintenance of which are necessary to the protection of society; but these circumstances cannot be considered by this court. When a fair trial has been had, and in face of a verdict amply supported by the evidence, the duty of this court is to apply

the law, developed through the experience of the centuries, and on which we have come to rely for the safety and security of our most sacred rights, and above all, our lives. The rules of law which guarantee this security must not be lightly thrown aside.

We have given careful consideration to every phase of this case. We find that when the defendant was arraigned, capable counsel was assigned to his defense, and represented him in the trial in which he was convicted; if there was any error in the trial, it has not been pointed out; the verdict of the jury on the evidence presented was fully warranted; the motion to set aside the verdict on grounds of insanity is not supported in such manner as to meet the test of the law, and was properly overruled; and it therefore follows that the judgment of the court below must be affirmed.

*Affirmed.*