State of West Virginia

*v.*

Winifred Lee Farley

(No. 10912)

Submitted January 21, 1958. Decided April 8, 1958.

446

*Slaven & Staker, Zane Grey Staker, John M. Rush,* for plaintiff in error.

*W. W. Barron,* Attorney General, *George H. Mitchell,* Assistant Attorney General, for defendant in error.

HAYMOND, PRESIDENT:

At the January Term, 1957, of the Circuit Court of Mingo County, the defendant, Winifred Lee Farley, was indicted for the murder of Clyde Fields on October 19, 1956, in that county. To the indictment the defendant entered his plea of not guilty. Upon the trial of the indictment during the January Term of the court a jury, on January 30, 1957, returned a verdict of guilty of murder of the second degree. The circuit court overruled motions of the defendant to set aside the verdict and grant him a new trial and in arrest of judgment and by judgment entered February 1, 1957, sentenced the defendant to be confined in the penitentiary of this State at hard labor for the term of from five to eighteen years.

On February 11, 1957, at the same term of court, the defendant made a motion to set aside the verdict and grant him a new trial on the ground of after discovered evidence and filed certain affidavits in support of the motion. By order entered March 16, 1957, the circuit court overruled the motion of the defendant and refused to grant him a new trial.

To the final judgment sentencing the defendant to confinement in the penitentiary this Court granted this writ of error and supersedeas upon the application of the defendant.

The sole question presented on this writ of error is whether the circuit court erred in refusing to grant the defendant a new trial on the ground of the after discovered evidence set forth in the affidavits filed by the defendant.

The homicide for which the defendant was indicted occurred between four o'clock and four thirty o'clock in the afternoon of Friday, October 19, 1956, at a beer tavern in Delorme, Mingo County, known as Don's Place, owned by Noah Ferrell, stepfather of the wife of the defendant. The one story building in which the tavern was operated is located about twenty five feet from the edge of the improved part of West Virginia Route No. 49 and fronts on that highway. The open space between the highway and the building extends along and beyond the front of the building for several feet in each direction. At the front entrance is a large single door which, when opened, swings inside the building and the bottom of the door is several inches above the level of the area between the building and the highway. Outside the building and directly in front of the door is one concrete step of normal height above the ground and the top of the step is a few inches below the level of the floor of the building and the bottom of the door. Inside the building is a large room in which are several booths on one side and a service counter and a bar on the side opposite the booths.

In the early part of the afternoon of the homicide, Clyde Fields, aged forty to forty five years, whose height was about five feet ten inches and whose weight was about 155 pounds, and who limped noticeably because of his use of an artificial leg, and Luther Daniels, a young man nineteen years of age, together visited and drank beer and moonshine whisky at two other taverns in the neighborhood of Don's Place before they came there between three o'clock and four o'clock for the purpose of obtaining more beer. They had no money and the defendant, who with Ferrell operated the tavern, would not permit them to have beer on credit. Ferrell also refused to let Fields have beer. Both Fields and Daniels were intoxicated and trouble occurred between Daniels and a customer named Artemis Mounts. During the altercation between them Fields invited anyone present who cared to do so to engage in a fight with him.

The defendant who was on duty in the operation of the tavern at the time then ordered both Fields and Daniels to leave the building. Fields obeyed, left the room, and remained outside in the open space in front of the entrance. Daniels refused to leave and told the defendant that if he left the defendant would have to put him out of the building. A fight between Daniels and the defendant then ensued during which the defendant hit Daniels three or four times with a wooden nightstick, one of the blows striking his head and ear. Daniels was knocked to the floor, and while on the floor he and the defendant struggled to get the nightstick. The defendant was on top of Daniels and while both were on the floor the defendant struck Daniels on his head with a .32 caliber revolver which the defendant drew from his pocket. After being struck with the revolver Daniels stated that he had "had enough." The fight between them ended and Daniels either rose to his feet or was pulled from the floor by the defendant and walked without assistance or was taken by the defendant to the open door at the front entrance to the building where the defendant pushed him through the doorway.

When pushed by the defendant Daniels came in contack with Fields who was then standing in front of the building near the entrance and both of them fell to the ground. Daniels arose and left the scene but while going away he heard the shot which hit Fields and saw him put his hand to his stomach and fall to the ground. After Fields was knocked down, when Daniels was pushed against him, he arose and either stood on the ground in front of the door or approached the door and attempted to enter but before he could get inside the building the defendant, who stood inside the building near the door, fired one shot from his revolver. The bullet struck Fields in the region of his chest, passed entirely through his body, severed a main artery, and produced internal hemorrhages which caused his death.

The testimony of the witnesses produced by the State was to the effect that Fields did not participate in the fight between Daniels and the defendant when it began or while it was in progress; that Fields made no threats and committed no hostile act against the defendant; that while the defendant was near the door with the revolver in his hand Fields swore at the defendant and told the defendant that he was "not scared of you or nothing you've got" and to "go ahead and shoot." Each of the five witnesses produced in behalf of the State, who were in or near the tavern and observed Fields, testified that he did not see a knife in his possession before or when the shooting occurred. After the defendant shot Fields he did not go to his assistance but told someone nearby to take care of Fields and then went from the door toward the rear of the room.

Six witnesses, including the defendant, testified in behalf of the defendant. The defendant, Noah Ferrell, his wife Jessie Ferrell and one other witness testified to the effect that on other occasions before the shooting occurred there had been trouble between Fields and the defendant and on each occasion Fields made threats to kill the defendant; and that Fields had made several similar threats out of the presence of the defendant which were com-

municated to him before he shot Fields on October 19, 1956. Other than the testimony of some of these witnesses that Fields was attempting to attack the defendant and to enter the building for that purpose with a knife or some instrument when the defendant shot him, there is no evidence that Fields while armed with any weapon ever attempted to execute any threat made by him to kill or injure the defendant.

The defendant, Noah Ferrell and Jessie Ferrell also testified to the effect that Fields was in the room when the fight between Daniels and the defendant began or while it was in progress and that he threw a beer bottle at the defendant which either grazed or struck him; that Fields, while standing in the door during the fight called to Daniels to give the defendant "a good one" and yelled to the defendant "I will kill you when this is over."; that when the defendant was standing near the door holding his revolver, Fields with a knife or other instrument in his hand was standing with one foot on top of the step in front of the door and the other foot in the doorway; that the defendant told Fields not to come in the place again and that he would shoot him if he did; that Fields told the defendant that the defendant would not shoot him, that he did not "have guts enough to shoot" and that he called the defendant a vile name; and that the defendant then shot Fields as he was attempting to enter the doorway. When the defendant was asked why he shot Fields he replied "I was scared."; "He was aimed to kill me."; and when asked why he did not run from Fields he answered "I had no place to run except to run in where my family was."

The defendant testified that when Fields attempted to enter the doorway before the defendant fired the shot he had one hand on the door frame and struck at the defendant with a knife which he had in his other hand. Noah Ferrell testified to the effect that while Fields was at the door, he had some instrument in his hand but the witness could not say that it was a knife. Eddie Dodson, who was in his automobile at a filling station near the

tavern where he went with his wife and two children for the purpose of getting gasoline, produced in behalf of the defendant, testified that when he came to the filling station he saw two men, one near the filling station and the other standing in front of the entrance to the tavern; that he heard cursing and loud talk; that one of the men was trying to get in the door and had one hand on one side of the door; that he was "gouging at something in there with something"; that the witness then heard the shot but did not see who fired it; that after the man at the door was shot he jumped backward, turned around and sank to the ground; and that the witness then left the station in his automobile and did not immediately make any report of the events which he had seen.

The defendant and some of the witnesses who testified in behalf of the State as well as some of the witnesses who testified in behalf of the defendant made and gave signed written statements concerning the manner in which the shooting occurred and what took place in the tavern before the shooting to a member of the Department of Public Safety who investigated the shooting shortly after it occurred, and these statements in some particulars differ from the testimony given at the trial by each witness who made a signed statement.

During the argument of the case to the jury the attorneys representing the State commented upon the failure of the defendant to produce the knife at the trial in support of their contention that Fields when shot did not have a knife in his possession.

Upon substantially the foregoing evidence the jury found the defendant guilty of murder of the second degree and by its verdict necessarily rejected the contention of the defendant that he shot Fields in self-defense.

On February 11, 1957, in support of his motion for a new trial on the ground of after discovered evidence, the defendant filed his affidavit and the separate affidavits of Julius Estep, Condy Stanley, Herbert Farley, and Clell

Blankenship, concerning the discovery and the nature of the alleged new evidence.

The affidavit of the defendant, dated February 11, 1957, in substance alleges that after he was convicted of murder of the second degree on January 30, 1957, he learned that the knife possessed by Fields at the time of the shooting had been discovered in the possession of Julius Estep of Roseann, Virginia; that Estep and Condy Stanley of Mohawk, West Virginia, were eyewitnesses and knew that the knife possessed by Fields was removed from the place on the ground where it had fallen after Fields was shot; that he did not know Estep or Stanley or that they were present at the scene of the shooting until after the trial had ended and that he could not have discovered or learned of the new facts concerning the removal of the knife and the presence of Estep and Stanley before or during the trial by the exercise of due diligence; that the foregoing evidence is new and material; that it is not merely cumulative; that it will not be offered to impeach any witness who testified at the trial; and that it ought to produce an opposite result upon a new trial in support of his plea of self-defense.

The statements in the affidavits of Julius Estep and Condy Stanley, dated February 8, 1957, are to the effect that on October 19, 1956, they were residents of Roseann in Buchanan County, Virginia; that Estep was then employed by Knox Creek Coal Company and Stanley, when he made his affidavit on February 8, 1957, was employed by Herbert Coal Company at Mohawk, West Virginia; that about four thirty o'clock in the afternoon of October 19, 1956, while traveling through West Virginia to their home in Virginia they stopped at Delorme on the side of West Virginia Route No. 49 opposite a tavern which they intended to visit to get beer; that at that time they noticed some trouble at the tavern; that they saw a man standing just outside the front door of the tavern and another man lunge out of the door, fall against the first man, and knock him to the ground; that the man who had lunged out of the door walked rapidly away from the front of the

tavern toward the town of Delorme; that the man who had been knocked down got to his feet, and pulled a knife from a pocket in his pants; that he raved and cursed and, waving a knife in his right hand, moved toward the door of the tavern; that at that time another man appeared in the door of the tavern holding a pistol in his right hand and told the man with the knife not to come back into the tavern; that the man with the knife advanced to the steps of the tavern, grasped the door with his left hand, put one foot on the door sill, and thrust forward with the knife; that the man who held the gun backed away; that at that time there was a shot and the man with the knife staggered backward from the doorstep toward the road for a short distance, placed his left hand near his chest and stomach, and slumped to the ground; that as he fell the knife in his right hand slipped from his fingers and dropped to the ground; that after the man fell to the ground another man whom Estep knew as Fonso Blankenship ran from the door of the tavern to the man on the ground and leaned over him; that the man on the ground asked for water; that the affiants, who ran across the road from the automobile to the place where the wounded man lay on the ground near the edge of the highway, thought he was intoxicated and not seriously or mortally wounded; that Estep saw the knife on the ground about a foot and a half or two feet to the right of the man and almost opposite his waist; that the knife was open and the blade was exposed; that Estep picked up the knife, closed it, and put it in his pocket; that at that time many people came in front of the tavern and other people in the tavern came outside; that affiants did not know the man who had been shot or the man who shot him; that when people congregated in front of the tavern affiants became apprehensive that there would be further shooting and fighting and for that reason they hurried back to the automobile and continued on their way to Roseann, Virginia; that on the way they looked at the knife and talked about the shooting; that Estep took the knife to his home, showed it to his wife, and put it in a jar on top of a refrigerator in his

dining room; that affiants were not in the neighborhood of Delorme after October 19, 1956, and did not know that the man who had been shot had died or that the defendant had been tried and convicted of murder until they were informed of those facts by Herbert Farley on February 7, 1957.

The affidavits of Herbert Farley and Clell Blankenship, dated February 11, 1957, set forth facts which led to the discovery by Herbert Farley that Estep and Stanley had witnessed the shooting and that Estep had taken the knife and had it in his possession. The affidavit of Herbert Farley sets forth that he located Estep near the mine of the Knox Creek Coal Company several miles from Roseann and that with the assistance of Estep he located Stanley at the mine of Herbert Coal Company on Panther Creek in McDowell County, West Virginia.

On March 9, 1957, in opposition to defendant's motion, the State filed an affidavit, dated March 1, 1957, made by S. S. Fleck, a member of the Department of Public Safety, who investigated the homicide before the trial. This affidavit does not specifically or directly deny the statements in the affidavits filed by the defendant concerning the presence of Estep and Stanley at or near the tavern when the shooting occurred or the taking of the knife from the place where Fields was lying by Estep but deals with an investigation made by the affiant and the assistant prosecuting attorney after they and the prosecuting attorney had examined the affidavits submitted to the prosecuting attorney by counsel for the defendant.

The affidavit of Fleck in substance alleges that he began the investigation on February 14, 1957, and that during the investigation he went to Roseann in Buchanan County, Virginia, and after talking to the state police and the sheriff in that county he learned that Estep was not employed by Knox Creek Coal Company at that time; that he was employed by it in the month of December, 1956, worked for a few days and disappeared, and that his whereabouts were then unknown; that Condy Stanley had

never worked for the Knox Creek Coal Company; that he learned from the superintendent, the store manager, and the bookkeeper of the Panther Coal Company at or near Roseann, Virginia, that they had no knowledge that Estep or Stanley had ever lived in that community and that neither of them had ever worked for that company; that he was informed by the postmistress at Roseann, Virginia, that sometime after February 1, 1957, a man named Julius Estep and his family had moved into a house in the Roseann community which house was occupied by about seven families; that she had been informed that Estep had come there from McDowell County, West Virginia; that she had never heard of Condy Stanley and that there was no record in her office of the receipt of any mail bearing his name; that prior to February 1, 1957, the name of Julius Estep had never appeared in her post office; that affiant then made inquiries at Hurley, Virginia, concerning Estep and Stanley, and was informed by the bookkeeper of Knox Creek Coal Company that Estep had boarded a short time at its Hurley clubhouse and that he had been employed by that company from December 26, 1956, until February 6, 1957; that Condy Stanley had never worked for that company; that affiant was unable to obtain any information in that community concerning the whereabouts of Estep or Stanley; that during his investigation affiant talked to Fonso Blankenship and learned from him that he had roomed and boarded at the Hurley clubhouse during the period October 19, 1956 to February 19, 1957; that Blankenship was present on October 19, 1956, when the homicide occurred; that immediately after the defendant fired the shot with his revolver and went to the interior of the building Blankenship went outside the tavern and found Fields lying on the ground near the highway directly in front of the tavern; that he was one of the first persons to go to Fields; that he knew Julius Estep at that time and when he later roomed and boarded at the Hurley clubhouse; that if Julius Estep had been or arrived where Fields was lying Blankenship would have recognized him; that he had no recollection of seeing

Julius Estep at the scene of the homicide; that while Julius Estep boarded and roomed at the Hurley clubhouse he and Blankenship ate at the same table and had conversations together on many occasions; that in their conversations Julius Estep never asked Blankenship any questions concerning the shooting at Delorme on October 19, 1956, or the death of Clyde Fields; that affiant after visiting at Roseann and Hurley went to Iaeger, McDowell County, West Virginia, and made inquiry concerning the whereabouts of Condy Stanley; that on February 26, 1957, affiant was informed by a member of the Department of Public Safety stationed in that county that for sometime prior to and on February 7, 1957, Stanley was employed by the Herbert Coal Company in McDowell County; that on the night of February 7, 1957, while at work, Stanley was called outside the mine by unknown persons and did not return to his work; and that since that date he had not worked for that company.

The firmly established rule is that a new trial is rarely granted on the ground of after discovered evidence and that a new trial on that ground will be granted only "under very special circumstances." *State v. Spradley,* 140 W. Va. 314, 84 S. E. 2d 156; *Cremeans v. Myers,* 136 W. Va. 157, 67 S. E. 2d 28; *State v. Poe,* 69 W. Va. 260, 71 S. E. 177; *State v. Stowers,* 66 W. Va. 198, 66 S. E. 323; *Carder v. Bank of West Virginia,* 34 W. Va. 38, 11 S. E. 716; *Strader v. Goff,* 6 W. Va. 257; *Brown v. Speyers,* 20 Gratt. 296; *Nichols, Admr. v. Jones,* 8 Gratt. 267.

This Court has uniformly held that "A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material,

and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Point 1, syllabus, *Halstead v. Horton,* 38 W. Va. 727, 18 S. E. 953; point 2, syllabus, *State v. Spradley,* 140 W. Va. 314, 84 S. E. 2d 156; point 11, syllabus, *Phenix Fire Insurance Company v. Virginia-Western Power Company,* 81 W. Va. 298, 94 S. E. 372. See also *Cremeans v. Myers,* 136 W. Va. 157, 67 S. E. 2d 28; *State v. Burdette,* 135 W. Va. 312, 63 S. E. 2d 69; *State v. Beckner,* 118 W. Va. 430, 190 S. E. 693; *Stike v. Virginian Railway Company,* 114 W. Va. 832, 174 S. E. 418; *Gray and Wayman v. Powell,* 102 W. Va. 440, 136 S. E. 40; *State v. Smith,* 112 W. Va. 284, 164 S. E. 792; *Cavender v. The Cline Ice Cream Company,* 101 W. Va. 3, 131 S. E. 862; *Burr v. The Limestone Telephone Company,* 97 W. Va. 508, 125 S. E. 335; *State v. Edwards,* 95 W. Va. 239, 120 S. E. 516; *Flat Top National Bank v. Parsons,* 90 W. Va. 51, 110 S. E. 491; *Gibbard v. Evans,* 87 W. Va. 650, 106 S. E. 37; *State v. Lemon,* 84 W. Va. 25, 99 S. E. 263; *Wadkins v. Digman,* 82 W. Va. 623, 96 S. E. 1016; *Jacobs v. Williams,* 67 W. Va. 377, 67 S. E. 1113; *State v. Stowers,* 66 W. Va. 198, 66 S. E. 315; *Stewart v. Doak Brothers,* 58 W. Va. 172, 52 S. E. 95; *Sisler v. Shaffer,* 43 W. Va. 769, 28 S. E. 721; *Carder v. Bank of West Virginia,* 34 W. Va. 38, 11 S. E. 716; *Swisher v. Malone,* 31 W. Va. 442, 7 S. E. 439; *Bloss v. Hull,* 27 W. Va. 503; *Dower v. Church,* 21 W. Va. 23; *Varner v. Core,* 20 W. Va. 472; *The State of West Virginia v. Williams,* 14 W. Va. 851; *State v. Betsall,* 11 W. Va. 703; *Gillilan v. Ludington,* 6 W. Va. 128; *Nadenbousch v. Sharer,* 4 W. Va. 203. If any of the foregoing five essential requirements is not satisfied or complied with a new trial will not be granted on the ground of newly discovered evidence. *Butts v. Butts,* 81 W. Va. 55, 94 S. E. 360.

It is sufficiently established by the affidavits filed by the defendant that he could not have discovered or se-

cured the new evidence mentioned in the affidavits of Estep and Stanley before the trial was concluded and that he has exercised due diligence in the efforts made in his behalf to obtain the new evidence. That evidence, however, is cumulative to the extent that it would corroborate the testimony of the defendant and would tend to establish the possession of a knife by Fields, at and immediately before the defendant shot him, in support of the contention of the defendant that he fired the shot in self-defense. If, however, the new evidence should be regarded as not being cumulative with respect to the production and presence of the knife, it is clear that it is not such evidence as ought to produce an opposite result, such as a verdict of not guilty or a verdict of guilty of either of the lesser offenses of voluntary manslaughter or involuntary manslaughter upon another trial of the case upon its merits.

Obviously the trial jury rejected the contention of the defendant that he shot Fields in self-defense, which was his only substantial defense to the crime charged in the indictment, and it is doubtful that, upon the evidence introduced at the trial and additional evidence in the form of testimony by Estep and Stanley concerning the facts stated in their affidavits and the physical production of the knife, the jury would have accepted the defendant's claim of self-defense. Even if the jury had been convinced, by the presence of the knife and the testimony of Estep and Stanley that Fields, armed with the ordinary pocket knife described by them, was in the act of attacking the defendant when he fired the shot which killed Fields, it is unreasonable to conclude that the trial jury or a jury upon a new trial of the case would find that the defendant, armed with a loaded revolver, and facing at a distance of a few feet a medium sized, older, intoxicated and crippled adversary with a pocket knife as his only weapon, entertained a reasonable belief that it was necessary to shoot and kill his adversary in order to escape death or grave bodily injury at his hands. On the contrary the reasonable conclusion is that, in the light of the

foregoing facts and circumstances, it was entirely unnecessary for the defendant to shoot Fields and that, instead of firing the fatal shot, he could have readily and successfully defended himself by using the revolver to strike down Fields, as he had struck down Daniels immediately before he pushed him through the doorway, or he could have retreated until he could receive assistance from his aggressive stepfather-in-law who could have promptly made use of the nightstick to repel, overcome and disarm Fields, or until the defendant himself could have possessed and used it against his lame assailant in the same skillful and effective manner in which he employed it only minutes earlier against the unruly and younger Daniels and reduced him to submission.

As the new evidence is not such evidence as ought to produce an opposite result upon another trial, it is not sufficient to entitle the defendant to a new trial. The action of the circuit court in denying the motion for a new trial on the ground of after discovered evidence did not constitute abuse of its discretion to grant or refuse a new trial on that ground and it will not be disturbed by this Court. See *Rogers* v. *Goforth,* 121 W. Va. 239, 2 S. E. 2d 903; *Duty* v. *Chesapeake and Ohio Railway Company,* 70 W. Va. 14, 73 S. E. 331.

For the reasons indicated the final judgment of the circuit court is affirmed.

*Affirmed.*