STATE OF WEST VIRGINIA

*v.*

ALLEN EUGENE STEWART

(No. 13744)

Decided December 20, 1977.

*Hague, Rudolph, Hague & Lantz, Eugene T. Hague and George E. Lantz,* for plaintiff in error.

*Chauncy H. Browning,* Attorney General, *Dennis M. Abrams,* Assistant Attorney General, for defendant in error.

MCGRAW, JUSTICE:

This is an appeal from a final order of the Circuit Court of Jackson County, by which order the circuit court entered judgment on a jury verdict finding the defendant guilty of delivery of a controlled substance. The defendant was sentenced to a term of one to five years in the West Virginia Penitentiary.

The undisputed facts are as follows:

On February 27, 1974, the regular Grand Jury for Jackson County, West Virginia, returned an indictment against the defendant, Allen Eugene Stewart, charging him with delivery of a controlled substance to D. M. Caldwell. Defendant entered a plea of not guilty to this indictment.

On July 1, 1974, defendant filed motions for particular information and for discovery. The State responded to the defendant's motion by stating that the alleged crime occurred on October 10, 1973; that the persons present at the time and place of the alleged crime were Trooper D. M. Caldwell; and that "an individual by the name of Dennis Ketchum, address unknown, may have been present." The State said that the witnesses it intended to call at the trial were Jeffrey Miller and R. C. Murphy. The defendant also filed a motion to disqualify the prosecuting attorney, Joseph C. Hash, Jr., as well as any of his present assistants on the ground that Mr. Hash had counseled with the defendant since the return of the indictment. An order was entered disqualifying the prosecuting attorney, Joseph C. Hash, Jr., and his present assistants. Philip E. D'Orazio, Assistant Prosecuting Attorney of Wood County, West Virginia, was appointed special prosecuting attorney, and on December 2, 1974, the State filed a "Supplemental Answer to Defendant's Motion for Particular Information" which added to the list of persons present at the time and place of the alleged crime a Richard Blackburn and an infant child. Three days later the State filed another "Supplemental Answer" stating that the witnesses it intended to call at trial were Trooper D. M. Caldwell, S. W. Kanick and Dennis Ketchum, rather than Jeffrey Miller and R. C. Murphy.

The case was set for trial on March 24, 1975, at which time a jury trial was conducted, and a deadlock jury resulted. Thereafter, the defendant filed a motion, with exhibits, to dismiss the indictment on the ground that the disqualified prosecuting attorney had interfered with the prosecution of the case since his disqualification, or in the alternative, to continue the trial. Both motions were overruled, and on July 14 and 15, 1975, a second jury trial was conducted and a verdict of guilty resulted.

At trial the defendant attempted to impeach the credibility of the witness Caldwell by using the testimony of Joseph C. Hash, Jr., to show an inconsistent statement

of Caldwell with regard to persons purportedly present at the scene of the alleged crime. The trial court disallowed this evidence.

At the conclusion of the State's case, the defendant moved to declare a mistrial on the basis of the "confusing, erroneous and misleading" discovery responses that had been furnished to the defendant prior to the trial. This motion was overruled. Shortly thereafter the defendant filed a motion to set aside the jury verdict and award a new trial, assigning eleven separate grounds in support thereof. The motion was overruled by the trial court, whereupon the defendant moved the court to refer the matter to its probation officer for a presentence investigation and to place the defendant on probation. This motion for probation was denied, final judgment of conviction was entered, sentence of one to five years in the West Virginia Penitentiary was imposed, but a stay to allow the defendant an opportunity to appeal to this Court was granted.

On or about December, 1975, defendant filed a written motion, with exhibits, to reconsider probation, to vacate the judgment on the grounds of fraud and failure of the State to disclose exculpatory evidence, and to set aside the verdict and award a new trial on the ground of newly-discovered evidence.

Incident to these motions and upon the request of defendant, the trial court ordered that "the official transcript of the testimony of Dennis O. Ketchum, given in this Court on November 3, 1975, in connection with criminal case no. 1029 and the official transcript of the proceedings in this Court on December 5, 1974, in connection with the case of State of West Virginia vs. Brian Bashaw, no. 852, be filed and made a part of the record in this case."

None of the matters testified to by Ketchum set out below were known by defendant or his counsel until a transcript of Ketchum's testimony was made available to them on or about November 21, 1975.

On December 19, 1975, the trial court denied the motion to reconsider probation and overruled the motions to vacate judgment and award a new trial.

I

Defendant's initial assignment of error is that the trial court erred in denying a defense motion to either dismiss the indictment or in the alternative to grant a continuance on the grounds that Joseph C. Hash, Jr., the previously disqualified prosecuting attorney, became involved in the prosecution of this case. For example, defendant argues that, "During the first trial of this case in March of 1975, it was shown clearly that Hash had interviewed, subsequent to his disqualification, the state's paid informer, Dennis Ketchum, concerning his knowledge and recollection of the incident which forms the basis for the indictment" and refers this Court to page 69 of the record submitted to us on appeal. Page 69 of the record before us is a copy of the second page of the defendant's July 7, 1975, post-trial motion to dismiss the indictment wherein he alleged to the court below that the above-mentioned interview took place.

It is fundamental in this state that this Court, in deciding a case before it, cannot consider errors that are not documented in the record. *See, e.g., Mahoney v. Walter*, ____ W. Va. ____, 205 S.E.2d 692 (1974). The general rule is that, "On error, the appellate review of a ruling of the circuit court is limited to the very record made there." Syllabus point 1 of *Hartman v. Corpening*, 116 W. Va. 31, 178 S.E. 430 (1935). This rule was applied in the similar case of *State v. Comstock*, 137 W. Va. 152, 70 S.E.2d 648 (1952), where the defendant alleged, but failed to document, that the grand jury was irregularly constituted since a jury commissioner was appointed by one without authority to do so. Since the defendant's claim that Prosecuting Attorney Hash improperly intervened in the case does not fairly arise from the record, we cannot consider it.

## II

The defendant further asserts that discovery responses furnished to the defendant were incorrect and misleading in that they were inconsistent with the evidence brought forth at the trial by the State and cites as error the trial court's failure to grant a mistrial.

This Court formulated the test regarding noncompliance with a pre-trial discovery order in the case of *State v. Cowan*, 156 W. Va. 827, 835, 197 S.E.2d 641, 646 (1973):

> "Whether the failure to disclose is a fatal non-compliance with a pre-trial order depends on its prejudicial effect on the preparation and presentation of the defendant's case."

In the case at bar, the witnesses called at trial were D. M. Caldwell, S. W. Kanick and Dennis Ketchum. Caldwell and Kanick testified, while Ketchum invoked his fifth amendment privilege against self-incrimination and refused to testify. At the end of the trial, the defendant's motion to declare a mistrial was overruled by the trial court.

We find that the State, through its response to discovery and subsequent amendments thereto, gave the defendant at least three months prior to the trial the names of the witnesses that it called at trial. This is not a case where the defendant was surprised with matters brought forth at trial of which he had no knowledge. We find that the furnishing of an ultimately accurate list of witnesses three months before trial did not sufficiently prejudice the defendant's case so as to warrant appellate relief.

## III

The defendant also assigns as error the trial court's refusal to allow him to impeach the credibility of the state's main witness by introducing evidence of a prior inconsistent statement. Trooper Caldwell, who was the lone prosecuting witness as to the alleged transaction, testified that Richard Blackburn, among others, was

present at the scene of the crime. On cross-examination he admitted that Blackburn was not named in his written report of the incident and further testified that he probably told Prosecuting Attorney Hash on or about February 27, 1974, that Blackburn was present at the scene of the crime. The defendant then called Hash, the previously disqualified prosecuting attorney, to testify in an attempt to impeach Caldwell's credibility. The trial court refused to permit Hash to testify, so the defense vouched the record out of the presence of the jury.

It is clear in this State that a witness may be impeached by proving that on another occasion he made statements inconsistent with or contradictory of his statements made during the trial, if the statements were material. *State v. Spadafore,* _____ W. Va. _____, 220 S.E.2d 655 (1975); *State v. Johnson,* 142 W. Va. 284, 95 S.E.2d 409 (1956); *State v. Carduff,* 142 W. Va. 18, 93 S.E.2d 502 (1956); *State v. Brown,* 104 W. Va. 93, 138 S.E. 664 (1927); *State v. Price,* 92 W. Va. 541, 115 S.E. 393 (1922); *State v. Koch,* 75 W. Va. 648, 84 S.E. 510 (1915). And, as this Court pointed out in syllabus point three of *Wilson v. McCoy,* 93 W. Va. 667, 117 S.E. 473 (1923):

> "When the proper foundation has been laid therefor by cross-examination, a witness may be shown by another witness to have made contradictory statements on prior occasions respecting the facts testified to by him, for the purpose of discrediting his testimony thereon."

Substantial case law, then, would dictate that Caldwell's testimony could be impeached by testimony of Hash indicating that Caldwell had made a prior inconsistent statement. It is axiomatic, however, that the testimony of Hash must show a statement by Caldwell that is indeed inconsistent with his statement now at trial. As this Court said in Syllabus Point 19 of *State v. Price,* 92 W. Va. 542, 115 S.E. 393 (1922):

> "[T]here must be a contradiction, a witness can be impeached by statements made by him out of court only when such statements are contradic-

tory to his testimony. If there is no substantial variance between such statments and his testimony, the statements cannot be introduced for purposes of impeachment."

Hash testified out of the presence of the jury that he did not recall Trooper Caldwell ever mentioning Blackburn one way or the other, and that the name of Richard Blackburn was, to the best of his knowledge, never discussed between him and Officer Caldwell. During this interrogation the Court asked Hash whether he had any specific recollection either that Caldwell did or did not tell him that Blackburn was present at the scene of the crime. To this Hash responded "No."

The testimony of Prosecutor Hash neither affirms nor refutes the testimony of Trooper Caldwell. Saying that one does not remember a conversation that allegedly took place months earlier is not the same as contradicting the substance of that alleged conversation. As this Court held in Syllabus Point 1 of *State v. Brown*, 104 W. Va. 93, 138 S.E. 664 (1927), "The inconsistency of the impeaching statement must appear clearly upon a direct comparison with the evidence of the witness, and cannot be based on a mere inference."

Therefore, there was no contradiction or inconsistency with Caldwell's statement sufficient to justify the admission of Mr. Hash's testimony. We find no error in the trial court's ruling on this point.

### IV

Defendant finally asserts that the trial court erred in failing to award a new trial on the ground of newly-discovered evidence.

The general rule regarding newly-discovered evidence is set out in the lone syllabus point in *State v. Farley*, 143 W. Va. 445, 104 S.E.2d 265 (1958), in syllabus point two of *State v. Spradley*, 140 W. Va. 314, 84 S.E.2d 156 (1954), in syllabus point ten of *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966), and in *State v. McGee*, ____ W. Va. ____, 230 S.E.2d 832, 834 (1976):

"A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Point 1, syllabus, *Halstead v. Horton*, 38 W. Va. 727 [18 S.E. 953]; Syllabus point 2, *State v. Spradley*, 140 W. Va. 314 [84 S.E.2d 156].

We must, therefore, examine the newly-discovered evidence and determine whether these rules have been met. If they have been met, then the trial court's denial of the motion for a new trial constitutes error.

There is little doubt that the first three rules listed above are met in this case. The testimony was given and discovered on November 3, 1975, four months after defendant's second jury trial, was "new and material and not merely cumulative," and is not such that it could have been secured before trial by due diligence. The state vigorously contends, however, that the fourth and fifth rules are not met and thus a new trial is not warranted. These two rules merit our consideration.

Opinion writers have, over the years, tended to mechanically assert that "[i]f any of the foregoing five essential requirements is not satisfied or complied with, a new trial will not be granted on the ground of newly-discovered evidence." *E.g.*, *State V. Hamric*, 151 W. Va. 1,

21, 151 S.E.2d 252, 265 (1966); *State v. Farley, supra* at 457, 104 S.E.2d at 271; *Butts v. Butts*, 81 W. Va. 55, 61, 94 S.E. 360, 363 (1917). But we cannot understand how this fifth rule can ever be "satisfied or complied with."

The fifth "rule" in *Farley* states that "the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Certainly the fifth "rule" does not mean that a new trial will always be refused when the sole object of the newly-discovered evidence is merely to impeach. It simply states *as a general rule* that the discovery of new impeachment evidence will not normally mandate a new trial. We feel that if the first four rules are satisfied in cases involving after-discovered impeachment evidence where the impeachment goes to the key prosecution witness, then a new trial should be granted. The fifth "rule" merely says that new and material impeachment evidence, discovered after trial, and not such that would have been secured before trial by due diligence, ordinarily is not the kind of evidence that satisfied the fourth rule (*i.e.* it is not the kind of evidence that "ought to produce an opposite result at a second trial on the merits.") We strenuously disapprove any intepretation of these "five rules" to the effect that a new trial will never be warranted if the newly-discovered evidence merely impeaches a witness. This fifth "rule" clearly contemplates a class of cases that fall outside of the general rule.[1]

---

[1] There are numerous state cases which have held that newly-discovered impeachment evidence warrants the granting of a new trial. For example, where key witnesses are found to have been mentally defective at the time they testified, new trials are granted. *E.g., Taborsky v. State*, 142 Conn. 619, 116 A.2d 433 (1955). When a witness in a false swearing case is found after trial to have made a prior inconsistent statement regarding who was present at the scene of the crime, a new trial was granted. *McGregor v. Commonwealth*, 253 S.W.2d 624 (Ky. 1952). Where an expert witness is found to have committed perjury at trial, a new trial is ordered. *Donati v. Gualdoni*, 216 S.E.2d 519 (Mo. 1948). And a host of other courts have granted new trials when a witness is discovered, after trial, to have made statements that tend to show that his testimony was perjured. Annot., 158 A.L.R. 1062 (1945).

The key rule in our case is the fourth one. We must now consider whether or not evidence "ought to produce an opposite result at a [third] trial on the merits." In doing so, courts evaluate the new evidence in light of the entire record. C. Wright & F. Elliot, 2 Federal Practice and Procedure § 557 (1969). Several cases in which newly-discovered impeachment evidence has mandated a new trial should be discussed.

The United States Supreme Court dealt with such evidence in *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed.2d 104 (1972). After trial, the defense counsel discovered that an Assistant United States Attorney says he promised the government's key witness, Taliento, that he would not be prosecuted if he testified against the defendant before a grand jury. But at the trial, Taliento had specifically said that "nobody told [him] he wouldn't be prosecuted" and the government's trial attorney, apparently unaware of the alleged promise, had stated in summation that, "[Taliento] received no promises that he would not be indicted." The court, in granting a new trial held:

> "Here the Government's case depended almost entirely on Taliento's testimony; without it there would have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Id.* at 154–55, 92 S. Ct. at 766, 31 L. Ed. 2d at 109.

Similarly, in *Napue v. Illinois*, 360 U.S. 264 79 S. Ct. 1173, 3 L. Ed.2d 1217 (1959) the state's principal witness said at the trial that he had received no promise of consideration in return for his testimony. But the state attorney in that case knew this testimony was false and did nothing to correct it. The court characterized the testimony of the witness, Hamer, as "extremely important because ... eyewitness identification [was] very difficult and uncertain, and because some pertinent wit-

nesses had left the state. On the basis of the evidence presented, which consisted largely of Hamer's testimony, the jury returned a guilty verdict . . . ." The court held the principle that a state may not knowingly use false evidence applies even where the false testimony goes only to the credibility of the witness.

"The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* at 269, 79 S. Ct. at 1177, 3 L. Ed.2d at 1221.

In *Ingram v. Peyton*, 367 F.2d 933 (4th Cir. 1966) the defendant discovered 16 years after trial that the prosecuting witness had a prior perjury conviction. The Fourth Circuit granted relief saying:

"After-discovered evidence, which is merely impeaching, cumulative or corroborating will not ordinarily invalidate a verdict, but if such evidence is of a character to raise a substantial likelihood that it would have affected the result if known at the trial, its nondisclosure cannot be ignored. It is reasonable to think that a jury, if made aware that the Commonwealth's principal witness was a convicted perjurer, would have been disposed to discount his testimony. In the absence of adequate independent evidence, the jury might well have entertained a reasonable doubt of Ingram's guilt." *Id,* at 936-37.

In the above-cited cases, as in most such cases where relief is granted, the witness whose testimony is impeached by the newly-discovered impeachment evidence is the principle or sole witness for the government without whose testimony there would be no conviction.[2] Such

---

[2] *But see Mesarosh v. United States,* 352 U.S. 1, 77 S. Ct. 1, 1 L. Ed.2d 1 (1956) where the government informer, whose testimony was later discredited by the government, was one of seven witnesses against the defendants; and *Williams v. United States,* 500 F. 2d 105 (9th Cir 1974) where a narcotics agent, who pleaded guilty subsequent to Williams' trial to count twelve of a twelve count

is the case at bar. The state called a total of three witnesses. Dennis Ketchum invoked his fifth amendment rights and thereafter answered no questions. The other witness, Trooper S. W. Kanick, was a state police chemist who testified solely about the substance allegedly sold by the defendant. The third witness was Trooper Caldwell, whose testimony defendant claims is sufficiently impeached by the newly-discovered evidence so as to mandate the granting of a new trial. A close review of Caldwell's testimony is necessary, in light of Ketchum's post-trial revelation, in order to help us determine whether such revelations "ought to produce an opposite result" on retrial.

It is abundantly clear to us that Caldwell was the principal witness against the defendant without whose testimony no conviction could have been attained. Every aspect of the state's case, except the proof of the identity of the alleged controlled substance, rested upon his uncorroborated testimony. In sum, he said that the defendant sold him marijuana on October 10, 1973, in the presence of a Richard Blackburn, among others. He admits that his knowledge of the date he began his investigation, the date of the alleged sale, and the presence of Mr. Blackburn are derived solely from his written records upon which he must rely and of which he has no independent recollection. When asked whether he made any other purchases that day, he replied, "I'm not sure. I'd have to check the record. I don't recall making any. It is possible I could have but I don't recall making any." Apart from a formal report, Caldwell states that a rough report of daily activity was usually prepared and typed by him for his own use and turned in to the Criminal Identification Bureau in Charleston. He said that these reports were sometimes made on the same date as the formal report and sometimes they were not. He "imagines" he made such a report in the Stewart

---

indictment charging perjury and conspiracy to deprive one of his civil rights, was one of the four witnesses and whose testimony merely corroborated the important testimony of another narcotics officer.

case, but "would have to check back on the record to find out." And, in any event, he is unable to recall when, if at all, such a report was made regarding the alleged Stewart transaction.

The defense was based upon an alibi. The defendant and his wife testified they were visiting her mother in Franklin, Virginia, on that date, and the defendant maintains he did not and could not have made the alleged sale. His wife further says that at no time did she ever see Caldwell in their mobile home, the place where the crime is alleged to have occurred. The defendant's mother-in-law says they did visit her around that period of time but could not remember the specific day they left. Richard Blackburn contended he was in Fort Lauderdale, Florida on October 10, 1973, and was not and could not have been present at any sale that allegedly took place on that date. What this boils down to is that the testimony of the defendant and his witnesses conflicts with Trooper Caldwell's written report(s).

Then, on November 3, 1975, comes Dennis Ketchum, the state's paid informant, who served as Caldwell's "sidekick" and who was instrumental in arranging various drug sales in and around Jackson County. Ketchum, who had himself been subsequently indicted for illegal delivery of controlled substances, secretly testified pursuant to a plea bargain about his activities as an informer working in Jackson County with undercover state police officers Caldwell and Miller. The transcript of this testimony was filed and made a part of the record in this case. Ketchum testified that when multiple buys of illegal substances occurred on the same day the written reports were altered to indicate that the buys were made on different days so that the agents could take days off and that the agents falsified their reports with regard to persons present at the scene of the alleged buy. Ketchum further testified that Caldwell fabricated, altered, and otherwise tampered with evidence, and that the West Virginia State Police Headquarters supplied the undercover agents with illegal substances for their own use and to put into circulation in Jackson County.

Here the principal witness for the state, Caldwell, is severely impeached by his assistant, Ketchum, who indicated that the reports from which Caldwell derived his testimony were routinely altered and falsified. Coupling these newly-discovered revelations with the defense based upon an alibi, this Court is convinced that there is a substantial likelihood that this newly-discovered evidence "ought to produce an opposite result" on retrial. Here the newly-discovered evidence impeaches the state's principal witness and lends support to the alibi defense of the accused. Since this fourth rule of newly-discovered evidence is met, the trial court erred in denying the defendant's motion for a new trial.

The judgment of conviction is accordingly reversed, and a new trial is awarded.

*Judgment reversed; new trial awarded.*