**Samuel Anstey, Petitioner Below, Petitioner v. David Ballard, Warden, Mt. Olive Correctional Complex, Respondent Below, Respondent**

**Supreme Court No. 15-0067**

**FILED**

**June 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Chief Justice Ketchum, dissenting**:

Oliver Wendell Holmes once stated: "Certitude is not the test of certainty. We have been cock-sure of many things that were not so."[1]

That statement encapsulates the error of the majority in affirming the denial of habeas relief. The error is twofold. First, the majority fails to realize that the State's investigating witnesses, based on group-think and the quantity of the evidence rather than its quality, concluded, unscientifically, that the fire was intentionally set. Second, the majority has accepted the determination of the habeas court that Anstey's assertion of newly-discovered evidence, *i.e.*, the advancement in fire science represented by NFPA 921, as amended, does not even warrant an omnibus habeas corpus hearing.

Given the complexity of the evidence, Anstey cannot reasonably present grounds for a new trial unless an omnibus habeas corpus hearing is conducted. Therefore, the issue is not whether this Court should award him a new trial. Instead, the issue is whether Anstey has made a case for an evidentiary hearing and whether the habeas court abused its discretion in

---

[1] Oliver Wendell Holmes, *Natural Law*, 32 Harv. L. Rev. 40 (1918).

1

denying him one. I am of the opinion that Anstey meets the standards which would entitle

him to an omnibus habeas corpus hearing. I, therefore, dissent.


**I. Standards For Conducting**
**An Omnibus Habeas Corpus Hearing**

The habeas court compared an eleven-day trial with the affidavits of two experts

submitted by Anstey and summarily concluded, without findings of fact and conclusions of

law, that "no testimony or other evidence is necessary." However, Rule 9(a) of the *Rules*

*Governing Post-Conviction Habeas Corpus Proceedings in West Virginia* requires as

follows:

> If the petition is not dismissed at a previous stage in the proceedings,
> the circuit court, after the answer is filed, shall, upon a review of the record,
> if any, determine whether an evidentiary hearing is required. If the court
> determines that an evidentiary hearing is not required, the court shall include
> in its final order specific findings of fact and conclusions of law as to why an
> evidentiary hearing was not required.[2]

---

[2] While a habeas court has discretion in deciding whether a hearing should be
conducted, the threshold warranting a hearing is low. *W.Va. Code*, 53-4A-7 [2008] of the
*Post-Conviction Habeas Corpus Act*, states, in part:

> If it appears to the court from said petition, affidavits, exhibits,
> records and other documentary evidence attached thereto, or the return or
> other pleadings, or any such record or records referred to above, that there
> is *probable cause* to believe that the petitioner may be entitled to some
> relief and that the contention or contentions and grounds (in fact or law)
> advanced have not been previously and finally adjudicated or waived, the
> court *shall* promptly hold a hearing and/or take evidence on the contention
> or contentions and grounds (in fact or law) advanced, and the court shall

2

The habeas court had before it Anstey's petition, the affidavits of his experts, the State's answer to the petition, and Anstey's response to the State's answer. The positions of the parties were, thus, joined and in sharp conflict over the evidentiary value of NFPA 921 as newly-discovered evidence. Nevertheless, the habeas court unfairly determined in a single paragraph without the requisite findings that an omnibus hearing would not be conducted. The habeas court then extrapolated findings and conclusions on the merits of Anstey's petition. As a result, this Court is left, on appeal, "greatly at sea without a chart or compass"[3] in the absence of an evidentiary transcript from which the ultimate findings of the habeas court may be reviewed. It was an abuse of discretion and a denial of Anstey's right to due process not to conduct an omnibus habeas corpus hearing in this case.

## II. The Mandate of the
## West Virginia Legislature

During the 1995 trial, State's expert Harold Franck referred to the NFPA standards as follows: "So it is a set of guidelines that have been developed over the past few years, and, *hopefully*, *the NFPA wants to have those as national standards at some point*." (emphasis added). Franck's surmise came true. NFPA 921 became the national authority for standards

pass upon all issues of fact without a jury.

(emphasis added)

[3] *See State ex rel. HCR ManorCare, LLC v. Stucky*, 235 W.Va. 677, 687, 776 S.E.2d 271, 281 (2015), citing *Workman v. Workmen's Compensation Comm'r*, 160 W.Va. 656, 662, 236 S.E.2d 236, 240 (1977).

in fire science and investigation years later in 2000 upon its endorsement by the United States Department of Justice.[4]

Since recognition by the Department of Justice, NFPA standards have been included in the law of this State by the West Virginia Legislature. *W.Va. Code*, 29-3-5(b) [2010], of the *West Virginia Fire Prevention and Control Act*, states in part: "Whenever any *new or revised* code or standard is adopted by the fire codes published by the National Fire Protection Association, the State Fire Commission may propose and promulgate revised rules reflecting such updated codes and standards[.]" (emphasis added). *See W.Va. Code*, 29-3-16a [2012] (adopting NFPA standards for the installation of smoke detectors and sprinkler systems in one- and two-family dwellings, including any "manufactured home"); Title 87 of the *Code of State Rules*: § 87-1-2 [2014] (adopting NFPA's National Fire Codes); and § 87-4-4 [2013] (adopting certain NFPA provisions with respect to the State Building Code). *See*

---

[4] Since 2000, a number of jurisdictions have recognized that NFPA 921 is an accepted reference, if not the "gold standard," for fire investigators: *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057-58 (8th Cir. 2005) (NFPA 921 is a reliable standard which is endorsed professionally); *U.S. v. Aman*, 748 F.Supp.2d 531, 536 (E.D. Va. 2010) ("NFPA 921 is sufficiently reliable to pass muster under *Daubert*."); *Tunnell v. Ford Motor Co.*, 330 F.Supp.2d 707, 725 (W.D. Va. 2004) (Many courts have recognized NFPA 921 as a peer reviewed and generally accepted standard.); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646 (D. Kan. 2003) ("The 'gold standard' for fire investigations is codified in NFPA 921, and its testing methodologies are well known in the fire investigation community and familiar to the courts."); *Farmland Mut. Ins. Companies v. Chief Indus., Inc.*, 170 P.3d 832, 836 (Colo. Ct. App. 2007) (A number of courts have held that NFPA 921 is an accepted reference for fire investigators).

*also* § 103-3-3.18 [2015] (pertaining to the State Fire Marshall, adopting standards and requirements as published by the NFPA).

Significantly, Series 8 of Title 87, designated "Volunteer Firefighters' Training, Equipment, and Operating Standards" (§ 87-8-1, *et seq*.), references a number of NFPA provisions concerning training levels, curriculum approval and equipment standards. The unit initially responding to and investigating the trailer fire in this case was the Oak Hill Volunteer Fire Department.

Syllabus point 5 of *Smith v. W.Va. Human Rights Comm'n*, 216 W.Va. 2, 602 S.E.2d 445 (2004), holds: "A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W.Va. Code*, 29A-1-2(d) [1982], and such a legislative rule has the force and effect of law." *Accord* syl. pt. 2, *State ex rel. Maple Creative LLC v. Tincher*, 226 W.Va. 118, 697 S.E.2d 154 (2010).

Accordingly, insofar as NFPA standards have been recognized by the West Virginia Legislature, the State Fire Commission and the State Fire Marshall, NFPA standards enjoy

a higher status than merely an expert opinion on what the proper standard ought to be.[5]  The

NFPA standards necessarily include NFPA 921.  In view of the extent to which NFPA

standards permeate West Virginia law, it cannot be said that NFPA 921 is excluded.  For

example, given the requirement of *W.Va. Code*, 29-3-16a [2012], that smoke detectors or

sprinkler systems are to be installed pursuant to NFPA standards in manufactured homes, it

makes no sense to ignore NFPA 921 where a fire in a manufactured home resulting in death

has occurred.


The incorporation of NFPA standards into West Virginia law, including NFPA 921,

was never addressed by the habeas court.  This State's incorporation of those standards

constitutes an additional reason why an omnibus habeas corpus hearing should have been

conducted.[6]

---

[5] Even before recognition by the Department of Justice in 2000, the fire codes published by the NFPA were a part of the law of this State.  *See W.Va. Code*, 16-3A-2(a) [1985] (requiring the State Department of Health to establish a list of hazardous materials and give consideration to "any list, publication, regulation, report, guideline or other compilation" of the NFPA);  *W.Va. Code*, 16-5N-7(d) [1997] (requiring residential care communities to comply with the "life safety code" promulgated by the NFPA and adopted by the State Fire Commission.); *W.Va. Code*, 21-3-3a [1965] (adopting standards of the National Electric Code as promulgated by the NFPA); *Reed v. Phillips*, 192 W.Va. 392, 395, 452 S.E.2d 708, 711 (1994) (The State Fire Commission "has adopted the 'National Fire Codes' published by the National Fire Protection Association ('NFPA') as a part of the West Virginia Fire Code."); *Teller v. McCoy*, 162 W.Va. 367, 375, 253 S.E.2d 114, 120 (1978) (The State Fire Commissioner's regulations include the National Fire Code published by the National Fire Protection Association).

[6] In the absence of scientific investigation guidelines, "many arson investigators believed that what they did was more of an art than a science - a blend of experience and

### III. Certitude Is Not Certainty

Without doubt, the fire investigation conducted by the volunteer firefighters at the trailer is questionable. The appendix record before this Court includes no reports or exhibits of any kind with regard to the underlying trial. All we have is the trial transcript. However, it is undisputed that the toaster and the trailer's breaker switches were manipulated during the first stages of the investigation. One of the State's witnesses in charge of the Oak Hill Volunteer Fire Department's investigation unit moved the toaster's plunger up and down before photographing the toaster.[7] Moreover, although volunteer firefighters had flipped the trailer's main electrical breaker to the off position, that same witness flipped three other breaker switches back and forth to the off and on positions to determine whether those switches had tripped during the course of the fire. His testimony in that regard seems uncertain:

> Q. Okay. Did you put them back basically where they had been, or did you put them in a different position?

---

intuition." David Grann, "Trial by Fire," *The New Yorker* (Sept. 7, 2009). "People investigated fire largely with a flat-earth approach . . . . It looks like arson - therefore, it's arson." *Id*.

[7] The trial transcript supports Anstey's assertion that this witness, who noticed the toaster on the countertop and saw the plunger in the down position "raised the plunger until it released" and then pushed it back down. Moreover, the witness moved or lifted the toaster to examine it, placed it back "in what he believed was its original position," and only then photographed the toaster. Anstey asserted: The mishandling of the toaster "is in direct contravention to the procedures that NFPA 921 requires for the preservation of evidence."

A. I would say I put them back to the off position. I flipped them off to – as sort of a reminder when I was doing a report or something what three breakers were tripped, in my opinion.

The evidence at trial concerning the electrical circuitry in the trailer was directly relevant to whether a living room lamp short-circuited resulting in the fire and tripping a breaker switch which, in turn, shut off the power to the electric smoke alarm.

In addition, unlike in the living room and kitchen areas of the trailer, the ceiling in the bedroom where the victim was found was still in place. Though never conclusively determined, Anstey's evidence indicated that ceiling tile was found among the debris on the vent in the victim's bedroom. That evidence supported Anstey's assertion that the debris was tracked into the bedroom by volunteer firefighters and that, therefore, there was no second fire in the trailer. Responding to the State's two-fire theory, Anstey maintains that the State's determination that a separate fire occurred in the victim's bedroom was conclusory and "in direct contravention with NFPA 921's requirement that all data pertaining to the determination of a fire's origin be analyzed."

Finally, it is worth noting that Anstey called two witnesses during the underlying trial who testified that the victim herself had threatened to set the trailer on fire. One of those witnesses, an acquaintance of the victim, stated: "She said on several occasions she would set fire to herself and burn everything up."

A case strikingly similar to the current matter was before the Court of Appeals of Indiana in *Bunch v. State*, 964 N.E.2d 274 (Ind. Ct. App. 2012). In *Bunch*, the defendant was convicted of the murder of her son involving a fire in their mobile home. The son was found in a bedroom and died at the scene from smoke inhalation. During the defendant's 1996 trial, the State relied largely on expert testimony which described the presence of an accelerant and two separate fires - one in the bedroom where the son was found and another in a doorway. In *Bunch*, the State used its two-fire theory to assert that the fires were intentionally set. The defendant's expert witness testified that the mobile home fire should have been classified as undetermined. The murder conviction was affirmed on direct appeal.

In 2006, the defendant, in *Bunch*, filed a petition for post-conviction relief claiming newly-discovered evidence in the form of advances in the field of fire science. Unlike the present case, the habeas court in *Bunch* conducted an evidentiary hearing during which the defendant presented the testimony of experts who discussed the scientific advances in relation to the mobile home fire. The habeas court, however, denied relief on the basis that the conclusions of the defendant's experts, that the fire was undetermined, was the same as that of the defendant's expert in the underlying trial. The habeas court, in *Bunch*, further concluded that the testimony of the defendant's experts merely tended to impeach the State's witnesses and did not constitute newly-discovered evidence.

9

The Court of Appeals of Indiana, in *Bunch*, reversed the decision of the habeas court and awarded the defendant a new trial, concluding that the new evidence was neither cumulative nor solely for purposes of impeachment. One of the grounds of reversal was the testimony of the defendant's post-conviction expert witness, Jamie McAllister. McAllister concluded that the fire started accidentally in a confined space (between the bedroom ceiling and the roof) and was not caused by an accelerant. McAllister's conclusion was based, in part, on the toxicology and autopsy reports indicating that the son, inhaling smoke and soot, reached an 80% carbon monoxide saturation level without thermal damage to his respiratory system, suggesting an under-ventilated fire rather than a well-ventilated fire in an open room. Granting the defendant post-conviction relief, the Court of Appeals in *Bunch* stated:

> McAllister also testified the consideration of a fire victim's physiological condition did not become a recognized component of the fire origin analysis until after 2001, the first time a chapter on the fire-related deaths appeared in the National Fire Protection Association 921 Guide for Fire and Explosion Investigations ("NFPA 921"), which is "a peer reviewed and generally accepted standard in the fire investigation community." *Travelers Prop. & Cas. Corp. v. General Elec. Co.*, 150 F.Supp.2d 360, 366 (D. Conn. 2001). * * * The post-conviction court's finding that [the defendant's] post-conviction evidence is just "different packaging" for the same conclusion does not give appropriate due to the science which has emerged since [the defendant's] trial to support that conclusion.

964 N.E.2d at 287, 289.[8]

___

[8] In *Bunch*, the Court of Appeals of Indiana noted that the Oklahoma, Nebraska and Arizona legislatures passed resolutions supporting judicial review of cases in which faulty science is alleged to have contributed to an arson conviction, with the Oklahoma

In *Bunch*, a post-conviction, evidentiary hearing was conducted. During the hearing, the defendant was able to develop the record with new expert testimony of a complex nature concerning the fire in the mobile home. Consequently, an expanded record and comprehensive order from the post-conviction court were before the Court of Appeals of Indiana for review. By contrast, no evidentiary hearing was conducted by the habeas court with regard to Anstey's petition which, as in *Bunch*, alleged newly-discovered evidence pursuant to an amended NFPA 921. The principles set forth in NFPA 921 played no part in Anstey's 1995 trial.[9]

resolution stating, in part, that "the Oklahoma State Senate urges the judicial branch, law enforcement agencies, and other relevant government entities in Oklahoma to employ NFPA 921 when conducting fire investigations." 964 N.E.2d at 288

[9] Here, the habeas court concluded that the testimony of Anstey's new experts would be the same as the testimony of his experts in the underlying trial. Moreover, the use of the new experts in a new trial would serve no other purpose than to impeach the State's witnesses. Both of those conclusions were rejected in *Bunch* by the Court of Appeals of Indiana which had the benefit of a fully developed record. The post-conviction record present in *Bunch* highlights, *a fortiori*, the absence of such a record in this proceeding.

Furthermore, as long as the testimony of Anstey's experts otherwise meets the elements of newly-discovered evidence, it is of no moment that their testimony will impeach the State's witnesses. Under the syllabus point in *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979), a new trial "will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." That consideration, however, is not to be mechanically applied. In *State v. Stewart*, 161 W.Va. 127, 239 S.E.2d 777 (1977), this Court stated that while new impeachment evidence "will not normally mandate a new trial," a new trial should be granted where all other considerations are met and the new impeachment evidence concerns the key prosecution witness. 161 W.Va. at 136, 239 S.E.2d at 783. In *Stewart*, this Court stated that it disapproved of any interpretation "to the effect that a new trial will *never* be warranted if the newly-discovered evidence merely impeaches a witness." *Id*. (emphasis added)

11

Manifestly, the publication of NFPA 921 and its periodic amendments do not, *per se*, constitute newly-discovered evidence in the absence of a nexus between its provisions and the facts of a particular case. Here, the habeas court summarily concluded that "no testimony or other evidence is necessary." I disagree. The granting of an omnibus habeas corpus hearing was warranted by the following: (1) the standards for conducting a hearing under the habeas rules and the *Post-Conviction Habeas Corpus Act*, (2) the recognition of NFPA 921 by the West Virginia Legislature, (3) the complexity and scientific aspects of the trial and post-trial evidence, and (4) the problems concerning the investigation at the scene.[10]

## IV. The NFPA 921 Affidavits

Ultimately, the question in this case is whether Anstey's affidavits from two new experts on fire investigation constitute newly-discovered evidence and justify an omnibus habeas corpus hearing. The experts are Dr. Gerald Hurst, a consulting chemist on fires and explosions, and Mark Goodson, a consulting engineer. Obviously, the fact that Hurst and Goodson's conclusions may coincide with the conclusions of Anstey's experts at trial does not mean that a jury will return the same verdict as before. As Anstey suggests, if a similar conclusion about the fire is more logically sound and can be shown to be scientifically valid

---

[10] In at least one instance, the expert testimony of the defense during the 1995 trial was problematic. Anstey's expert in electrical engineering prepared a "Toaster Circuit Diagram" concerning the toaster found in the trailer. At trial, the expert acknowledged that one of the toaster's components of some importance shown in the diagram was inaccurately depicted.

12

based on NFPA 921 criteria, as amended, the conclusion is likely to be more persuasive and readily acceptable by a jury.[11]

Hurst's affidavit notes that, since its initial publication in 1992, new editions of NFPA 921 have been issued every three or four years and that the 2011 edition is the current version. Concluding that the trailer fire remains undetermined, Hurst indicates that "to a reasonable degree of scientific certainty" the State's investigation "did not conform to recommended fire investigative protocol, was not conducted in a methodical and reliable fashion, and did not utilize the scientific method to determine origin and causation." Specifically, Hurst determined that the State's hypothesis, that a fire originated with the toaster and also in the victim's bedroom, was not scientifically valid. Instead, according to Hurst, the State's hypothesis fell victim to "expectation bias," rather than validation through

---

[11] NFPA 921 sections 1.3 and 4.1, included in the appendix record, state in part:

> 1.3 These procedures represent the judgment developed from the NFPA consensus process system that if followed can improve the probability of reaching sound conclusions. Deviations from these procedures, however, are not necessarily wrong or inferior *but need to be justified*.

> 4.1 *The use of a systematic approach often will uncover new factual data for analysis, which may require previous conclusions to be reevaluated*.

(emphasis added)

13

the scientific method.[12]

Mark Goodson notes in his affidavit that NFPA 921 incorporates the scientific method into the field of fire investigation and has become the standard for assessing the reliability of expert testimony.  With regard to the trailer fire, Goodson concluded:

> It is clear based upon my review of the transcripts of the State's origin and cause witnesses that they did not follow the scientific method in connection with their investigation of the trailer fire.  Rather, the State's experts relied upon outdated methods that had permeated the fire investigation community for years prior to the time of their investigation and testimony, and those methods are no longer accepted within the fire investigation community today.

Attached to Hurst and Goodson's affidavits is an appendix which lists the materials, in compact disc form, provided for Hurst and Goodson's review.  The materials consist primarily of testimony and exhibits from Anstey's 1995 trial.  Although a large quantity of material was provided, Goodson's affidavit suggests that the data is not a reliable source to

---

[12] For example, Hurst observed:

> Mr. Franck testified that the presence of patterns inside the toaster's cover indicated that the toaster's power cord had been stuffed inside the toaster.  There is no evidence beyond Mr. Franck's opinion-based assertion, however, in support of the conclusion that the cord was stuffed up inside the toaster.  Although such an observation would have been unusual and worthy of noting and photographing, neither of the fire department officials who first identified and seized the toaster at the scene made any mention of the cord being inside the toaster.

use in trying to determine how the fire started.[13]  For example, Goodson states in his affidavit:  "It is standard engineering practice to x-ray breakers from circuits that feed suspected fire causative appliances (in this case, the toaster) and to test the breakers electrically for proper functioning.  This was not done."

It has been said that expert opinion "is only an ordinary guess in evening clothes."[14] While that statement appears descriptive of the evidence in Anstey's 1995 trial, it is not reasonably applicable to the new evidence, backed up by NFPA 921, which Anstey seeks to present in this habeas corpus proceeding.  At the very least, the affidavits of Hurst and Goodson rightly form the basis for granting an omnibus habeas corpus hearing.

## V. Conclusion

In my view, Anstey has shown newly-discovered evidence in the form of the advancement in fire science and arson investigation in the intervening years since his conviction. The advancement is represented by the *National Fire Protection Association 921*

---

[13] The appendix indicates that the testimony of firefighters, fire investigators and expert witnesses, as well as exhibits, for both the prosecution and the defense were provided to Hurst and Goodson.  One of the compact discs contains in excess of eighty exhibits, mostly photographs.  Among the many items photographed are the kitchen area; the toaster with the plunger in the down position; the inside of the toaster; the coffee pot, microwave and stove; ceiling damage in the living room; the lamp in the living room; smoke and heat damage; Anstey's bedroom; the victim's bedroom; the breaker box; and debris in the victim's bedroom.

[14] *Earl M. Kerstetter, Inc., v. Commw.*, 404 Pa. 168, 171 A.2d 163, 165 (1961).

*Guide for Fire and Explosion Investigations* (NFPA 921). NFPA 921, as amended, is now recognized by the Department of Justice and by this State through the mandate of the West Virginia Legislature.

Moreover, Anstey has correctly shown that the habeas court's refusal to grant him an evidentiary omnibus habeas corpus hearing prevented him from demonstrating the substantial impact of NFPA 921 on the expert testimony presented during his 1995 trial. The evidence Anstey proposes to introduce may very well place his conviction in a different light by exposing the conclusions of the State's witnesses as objectively unreliable. However, he cannot present that evidence as grounds for a new trial unless a hearing is conducted. The circuit court abused its discretion in denying Anstey the opportunity to develop the record. Due process requires an omnibus habeas corpus hearing in this case.[15] Therefore, I respectfully dissent.

---

[15] On February 6, 1998, Anstey filed an unrelated petition for a writ of habeas corpus in the Circuit Court of Fayette County styled *State ex rel. Anstey v. Trent*, 98-C-46 (1998). The circuit court dismissed the petition on February 11, 1998. Anstey appealed the dismissal to this Court, alleging that the habeas court abused its discretion by denying him "an opportunity to develop his contentions at an omnibus hearing." Anstey stated that numerous errors in his underlying trial needed to be developed, including disqualification of the trial judge, prosecutorial misconduct, and ineffectiveness of defense counsel. Anstey's appeal to this Court from the denial of habeas relief was refused on December 16, 1998, and his motion to reconsider this Court's refusal was denied on January 21, 1999.